MISSISSIPPI POWER Co. *et al. v.* STRIBLING.

(In Banc. Sept. 22, 1941. Suggestion of Error Overruled Nov. 10, 1941).

[3 So. (2d) 807. No. 34586.]

Wilbourn, Miller & Wilbourn and Jacobson, Snow & Covington, all of Meridian, and Eaton & Eaton, of Gulfport, for appellants.

Mars & Lewis and Earl Richardson, all of Philadelphia, and Reily & Parker, of Meridian, for appellee.

**Anderson, J.,** delivered the opinion of the court.

The appellee, Stribling, brought this action in the circuit court of Neshoba County against the Mississippi Power Company, the Mississippi Utilities Company and J. B. Gully, their manager, to recover damages for an injury suffered by him while a servant of said companies, which he alleged was caused through the fault of the defendants, and recovered judgment in the sum of $30,000, from which judgment the Power Company and the Utilities Company appealed. Stribling charged in his declaration that as servant of the Power Company and Utilities Company it was his duty to service and keep in repair refrigerators sold to their customers by the Power Company; that they were electric refrigerators, the refrigerant be-

ing sulphur dioxide gas; that in servicing the refrigerators it was often necessary to purge them of the sulphur dioxide gas and when through making the repairs replace the gas; that during the year 1935 while so engaged he contracted tuberculosis which disabled him physically for life; that the gas was highly inflammatory to the eyes, throat and lungs which resulted in his contracting tuberculosis; that the plaintiff was unaware of the dangers of breathing the gas and the defendants wholly failed to inform him of such dangers and how to protect himself against them, although there existed complete protection which they could have furnished him at small cost.

The defendants assign and argue several alleged errors committed by the court below; among those which will be considered and disposed of first is that they were entitled to a directed verdict, and, if mistaken in that, a new trial on the ground that the verdict of the jury was against the overwhelming weight of the evidence. Both contentions are without merit although the evidence was conflicting to the extent that the jury would have been justified under the law in finding a verdict either way. Stribling testified, and he was substantially supported by other witnesses experienced in and observers of the services he was required to perform, that in repairing such refrigerators it was generally necessary to first purge them of the gas, make the repairs and then replace the gas; that if no protection therefrom was used the gas was highly inflammatory to the nose, throat and lungs causing the eyes and nose to run water and constant coughing and pains in the lungs; that the plaintiff was not aware of the dangers incident thereto and the defendants did not warn him of them and furnish him protection against them, as they could have done at little cost; that his lungs became chronically inflammed and thereby a fertile field for tubercular germs, and that the result was he contracted tuberculosis causing him permanent disability. Dr. Harrington, testifying to the dangers of sulphur dioxide gas used the following language: ''Well sulphur dioxide gas has an

irritating effect. It irritates the mucous membrane that it comes in contact with. This gas as it comes in contact with the membranes is converted into sulphuric acid. Sulphuric acid is one of the most caustic acids we have, destroying the tissue that it comes into contact with, and the amount of sulphuric acid liberated or formed by coming in contact with the mucous membrane would depend on the amount of gas inhaled, and that in turn would depend on the amount of sulphuric acid formed. The liberation of sulphur dioxide can be done, because it can be inhaled and the inhalation causes it to cause sporadic spasm of the throat. When inhaled in concentrated form it causes inflammation of the linings of bronchial tubes and the air passages become involved as a result of the exposure to the gas. In my opinion a more serious effect would be produced by the inhalation of the gas in a weak dilution over a long period of time than it would be by one or two inhalations of concentrated solution in short duration of time. In other words the gas would act on the lungs and the respiratory tract and have the same effect towards causing tuberculosis that a farmer plowing up his field in the spring of the year would have in the making of the ground, which is the preparation of the soil. We all come in contact with tuberculosis every day of our life. If our resistance is up to par it has no bad effect, but when anything happens to our system, that is to say whatever part of our system, that lowers our resistance in that area, whether it be the kidneys or what not, and the bug is planted there, then he goes to growing just like your corn grown in the field when you fix the land. If the field is right for your corn to grow, then it goes to growing, and the bug gets into a field that is irritated then he goes to growing, and that would be the action of the $SO^2$ dioxide in causing tuberculosis.''

Dr. Harrington was supported in that respect by Drs. Flynt, Vosburgh and Sheffield and one Mayo who owned and operated the Philadelphia Electric Company. The witnesses for the defendants, including physicians, ad-

mitted the highly inflammatory nature of the gas, but denied that they had ever known or heard of tuberculosis resulting therefrom. The evidence showed, however, that Turner Gully, another of the companys' employees, who was engaged to a large extent in the same character of service that the plaintiff was employed in, contracted tuberculosis while so employed. There was no conflict in the evidence to the effect that there were at least two perfect methods of protection against the harmful effects of the gas which could have been furnished by the defendants at small cost, namely a gas mask, a bucket of lye water for draining the gas into with a tube. According to plaintiff's evidence the defendants neither warned him of the dangers of inhaling the gas nor furnished him any means of protection therefrom. On the other hand, the evidence for the defendant tended to show that they kept in their office a bucket of lye water for the purpose, and so informed the plaintiff. The plaintiff testified that while engaged in his duties during the year 1935 he had a chronic cough and his lungs were inflamed to a high degree and pained him a great deal.

The position of the defendants is that they are not liable in damages for the injury to the plaintiff caused by tuberculosis because they had no notice either by experience or otherwise that the inhaling of the gas might reasonably result in that disease. On the other hand, the plaintiff contends and the court below so held that if the evidence showed (as it did with little conflict) that the inhaling of the gas might reasonably cause some serious harm to the plaintiff, then it was the duty of the defendants to warn him against such harm and furnish him the means of protection therefrom; that it did not devolve on the plaintiff to show that tuberculosis was one of the results that might be expected; in other words, that plaintiff made out his case by showing that serious injury might result without his putting his finger on the particular serious harm. The following authorities support the plaintiff's position: American Sand & Gravel Co. v.

Reeves, 168 Miss. 608, 151 So. 477; Whitehead v. Newton Oil & Mfg. Co., 105 Miss. 711, 63 So. 219; Illinois Cent. R. Co. v. Gill, 88 Miss. 417, 40 So. 865; Ness Creameries v. Barthes, 170 Miss. 865, 155 So. 222; Benjamin v. Davidson-G. Fert. Co., 169 Miss. 162, 152 So. 839; Wilbe Lbr. Co. v. Calhoun, 163 Miss. 80, 140 So. 680; National Casualty Co. v. Hoage, 64 App. D. C. 33, 73 F. (2d) 850. In the Gravel Company case, the court held that the master is charged with knowledge of the usual and ordinary dangers and hazards to which he is exposing his employee and is bound to know the nature of the constituents and general characteristics of the substances used in and about his business or in that part thereof wherein an injury may occur or has occurred; and this rule is applied without serious question in cases of the use of dangerous chemicals. In the Newton Oil Co. case the plaintiff was injured by a drop of sulphuric acid getting into his eye. He had not been warned of the danger. He was directed by one in authority to assist the carpenter in the repair of certain beams or braces which supported a mixing apparatus and a tank containing sulphuric acid. There were leaks in the tank through which the acid dropped. This was known to those in charge of the company's plant but was unknown to the plaintiff. He was not informed of the leak or warned of the danger attending the work about the tank. By reason of the acid getting into his eye he lost the eyesight and the other eye was affected to the extent that its functions were impaired. Judgment for the plaintiff was affirmed. In the Illinois Central Railroad case the plaintiff was injured by creosote getting into his eye. He had not been warned of this danger by the Railroad Company. The court held that the fact that the master failed to warn the plaintiff was sufficient to sustain the liability. In the Ness Creameries case the deceased was injured when a pipe containing ammonia was caused to break and release the ammonia which was inhaled by him resulting in his death. The basis of liability was that the pipe containing the ammonia was not

reasonably safe due to weakness developed from vibration and crystallization. The evidence for the defendant in that case showed that the pipe was attached to the ammonia tank in the usual and ordinary manner. The judgment for the plaintiff was affirmed. In the Davidson-Gulfport Fertilizer Co. case the court held that whether the master, in failing to furnish a respirator to the servant while unloading a car of phosphate rock dust and properly ventilating the car, proximately caused bronchial pneumonia resulting in the servant's death was a question for the jury; and that whether the master knew or by reasonable care should have known that the inhalation of the dust by the servant was injurious, and that furnishing a respirator or other protection would have prevented the pneumonia, was a question for the jury. In the Wilbe Lumber Company case the plaintiff was injured while working about a rip-saw. He claimed that the saw was unsafe because not provided with a guard which would have prevented the injury. The evidence showed that some mills used the guards, while others did not, but the tendency was toward a general use thereof. The judgment for the plaintiff was affirmed. The National Casualty Company case, decided by the U. S. Court of Appeals for the District of Columbia, is strongly in point. The court held that where the evidence showed that a janitor, from the time of inhaling sulphur dioxide gas in an apartment house basement until his death approximately five months later, was an invalid in care of physicians suffering constantly from an inflammatory condition of the bronchial tubes, it was sufficient to show that there was a causal connection between the exposure to the gas and death without intervening and independent cause. There was sufficient evidence to put the case to the jury on the issue of liability, and it cannot be said with a sufficient degree of confidence that the verdict of the jury was against the overwhelming weight of the evidence.

The plaintiff's attorneys, one of whom was Clayton Lewis, represented him on a contingent fee basis alone.

After the case had been on trial for four days and was about ready for argument before the jury, the defendants' attorneys discovered for the first time that Payne, one of the jurors, and the attorney, Clayton Lewis, were first cousins, their mothers were sisters, and Mr. Lewis knew of that fact and said nothing about it to any of defendants' attorneys. Thereupon the latter made a motion that the jury be discharged on that ground and another trial be granted. The motion was overruled to which action of the court defendants excepted. Evidence was taken on the trial of the motion and a special bill of exceptions was signed by the Judge embodying the facts in reference to the matter. The facts are undisputed. They were substantially as follows: A jury of twelve men was empaneled and presented to the parties. Four of them were challenged and stood aside. However, before that was done, Mr. Reily, one of the attorneys for the plaintiff, asked the members of the jury whether any of them were related to any of counsel on either side. They answered that they were not. Four other jurors were put in the place of the four excused. Neither the court nor any of the attorneys on either side asked these four jurors as to such relationship. When Mr. Reily asked the question of the first twelve jurors the four substitute jurors were in the court room and could have heard the question and answers.

In considering this question it should be borne in mind that the plaintiff's attorneys in this case were parties in interest, although not nominal parties. They had the same character of interest as the plaintiff in the case. Section 31 of the Constitution provides among other things that the right of trial by jury shall remain inviolate. It is the duty of the court to see that a competent, fair, and impartial jury is empaneled. McCarty v. State, 26 Miss. 299; Garner v. State, 76 Miss. 515, 25 So. 363; Davis v. Searcy, 79 Miss. 292, 30 So. 823; Ferriday v. Selser, 4 How. 506, 5 Miss. 506; Hubbard v. Rutledge, 57 Miss. 7; Louisville R. Co. v. Mask, 64 Miss. 738, 2 So. 360;

Berbette v. State, 109 Miss. 94, 67 So. 853; Dennis v. State, 96 Miss. 96, 50 So. 499, 25 L. R. A. (N. S.) 36; Cody v. State, 3 How. 27; Mississippi Public Service Company v. Collier, 183 Miss. 271, 183 So. 379; Wilbe Lumber Company v. Calhoun, 163 Miss. 80, 81, 140 So. 680. This action of the court was error. A lawyer's duties are not confined alone to serving his clients. He is an officer of the court and as such is called on to do and say whatever is necessary to promote the fair administration of justice. Mr. Lewis should have called the court's and opposing counsel's attention to his relationship to the juror. Later on in connection with another question there will be stated the effect that ought to be given this error.

During his argument on behalf of the plaintiff, Mr. Richardson, one of his attorneys, stated that the defendants, the Mississippi Power Company and the Mississippi Utilities Company both belonged to the Commonwealth & Southern Corporation which he said was the largest corporation in the United States and England, and that these two defendant corporations "call themselves Mississippi Power Company and Mississippi Utilities Company but that they did not have a thing in the world to do with Mississippi except collect Mississippi dollars and kill Mississippi people," and further, that Hon. Wendell L. Willkie, candidate for President of the United States on the Republican ticket, was once president of the Commonwealth & Southern. The defendants' attorneys objected to this argument, moved the court for a mistrial, that the jury be discharged and another trial granted. Thereupon the court instructed the jury orally and later in writing not to be influenced by that language used by Mr. Richardson. Defendants' motion for a mistrial was overruled, and that action of the court was excepted to and is assigned and argued as error. In Newman Lumber Co. v. Norris, 130 Miss. 751, 94 So. 881, the plaintiff's attorney in arguing a case before the jury used this language, "Who is the J. J. Newman Lumber Company?

It is a corporation. It has taken your land. It has taken your timber. It has taken your homes." The court held that this argument was harmful; that "it was such grave misconduct in counsel as that it is doubtful whether its effect on the jury was obviated by the admonition of the court. Counsel may so abuse the privilege of advocacy as to put it beyond the power of the court to remedy the harm done the opposite party." The judgment of that case was reversed on that ground and another. These two errors must have had a very substantial influence in bringing about the verdict for the plaintiff in this case, especially in fixing the amount of the verdict. The judgment should be reversed on that account.

The defendants assign as error the action of the court in refusing to instruct the jury that the plaintiff was not a servant of the Mississippi Utilities Company and for that reason they should render a verdict for that company; and the giving of instructions for the plaintiff submitting that question to the jury. There was really no substantial evidence that the plaintiff was employed alone by the Utilities Company. The evidence showed without any real conflict that the Mississippi Power Company was engaged at Philadelphia in furnishing the public electric power, and in addition selling and servicing electrical refrigerators, and the Utilities Company was engaged in furnishing the public water and ice; that the Commonwealth and Southern Corporation owned the entire stock of both of those companies; that J. B. Gully was their general manager at Philadelphia; that originally the plaintiff, Stribling, was employed by the Utilities Company and Turner Gully was employed by the Power Company, but that later on the two companies consolidated and combined their business in Philadelphia, made all the employees joint employees of both companies. J. B. Gully, the manager, so testified as did the plaintiff and Turner Gully. Under this arrangement Turner Gully and the plaintiff often at the request of both companies and their manager, Gully, serviced refrigerators sold by

the Power Company. In the case of Sawmill Co. v. Bright, 116 Miss. 491, 77 So. 316, the plaintiff was employed by the Sawmill Construction Company, was paid by that Company, but it was the practice of the Sawmill Company and the Lumber Company to work their respective employees in common and to exchange the service of their employees whenever either thought proper to do so. The court held that all the employees therefore were common to both. There was no error therefore in refusing the instructions requested by the defendants and granting the ones given the plaintiff on this question.

We think the assignments of error addressed to other instructions granted and refused are of so little merit as not to call for discussion.

The assignment that the verdict is excessive and that the judgment ought to be set aside on that ground is not decided for the reason that having determined that a peremptory would not be proper and that the verdict on liability for some amount would not be against the overwhelming weight of the evidence, but that the judgment must be reversed for the two reasons above given, it is not necessary to enter into discussion whether the amount of the vacated verdict was excessive or whether all the elements allowed to be considered by the jury in arriving at the amount of the verdict were proper elements. We do not consider or decide whether the development of tuberculosis was, under the evidence, a probable consequence of negligence, leaving this open for more deliberate consideration on another trial.

Reversed and remanded.

### DISSENTING OPINION.

**Smith, C. J.**, delivered a dissenting opinion.

I concur in the holding that the court below committed no error in refusing (1) to grant the appellant a directed verdict; and (2) to set the verdict aside on the weight of the evidence.

I express no opinion as to error, or no, in the granting and refusing of the numerous instructions appearing in the record.

I dissent from the holding that error appears in the rulings of the court below on the appellants' complaints as to the juror Payne, and the argument of the appellee's attorney to the jury, and therefore unless error appears in the instructions, I am of the opinion that the judgment of the court below should be affirmed, insofar as it imposes liability.